UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NIPPONKOA INSURANCE COMPANY, LTD.

                       Plaintiff,

        -against-

C.H. ROBINSON WORLDWIDE, INC. and CNR CARRIER, INC.

                       Defendants.

**MEMORANDUM
OPINION & ORDER**

09 Civ. 2365 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Nipponkoa Insurance Company, Ltd. brings this action as the subrogated insurer of the shipper Ricoh America Corporation against C.H. Robinson Worldwide, Inc. ("CHRW" or "Defendant").[1] Nipponkoa alleges that CHRW should be held liable for damage to two shipments of Ricoh's goods. The Amended Complaint sets forth claims under the Carmack Amendment and state law causes of action for breach of contract, breach of bailment obligations, negligence, and tortious damage to property arising out of gross negligence or reckless or willful misconduct. (Am. Cmplt. ¶¶ 17-44) CHRW now moves for summary judgment as to all of Plaintiff's claims.

        Because there are material issue of facts concerning whether CHRW acted as a carrier or as a broker with respect to these shipments, the applicability of the Carmack Amendment cannot be determined as a matter of law. Accordingly, Defendant's motion for summary judgment will be denied as to the Carmack Amendment, contract and bailment causes

---

[1] On October 21, 2009, pursuant to the parties' stipulation, all claims and cross-claims against CNR Carrier, Inc. ("CNR") were dismissed. (Docket No. 27)

of action.  Plaintiff has offered no evidence supporting its claims of negligence and tortious damage to property, however, and CHRW will be granted summary judgment as to those claims.

## BACKGROUND

This case involves two shipments of office equipment that were damaged during transport.  On June 20, 2008, Ricoh shipped 91 pieces of printing and copying equipment from Tustin, California to Breinigsville, Pennsylvania.  (Def. R. 56.1 Stat. ¶ 5; Am. Cmplt. ¶ 7)[2]  Ricoh hired CHRW to provide transportation services in connection with this shipment.  (Def. R. 56.1 Resp. ¶ 31)  CHRW, pursuant to a pre-existing agreement with CNR, arranged for CNR to transport the shipment from California to Pennsylvania.[3]  (Def. R. 56.1 Stat. ¶¶ 5, 18; Def. R. 56.1 Stat., Ex. Q; Pltf. Resp. to Def. R. 56.1 Stat. ¶ 5)  During transport, the truck – owned and operated by CNR – was involved in an accident, and the cargo allegedly suffered $600,000 in damages.  (Am. Cmplt. ¶¶ 8, 11; Def. R. 56.1 Stat. ¶ 6; Def. R. 56.1 Stat., Ex. F)

On July 30, 2008, Ricoh shipped 166 pieces of printing and copying equipment from Tustin, California to Tampa, Florida.  (Def. R. 56.1 Stat. ¶ 7; Am. Cmplt. ¶ 12)  Ricoh hired CHRW to provide transportation services for this shipment as well.  (Def. 56.1 Resp. ¶ 31)  Eduardo Perez, d/b/a Big Ed Express, transported this equipment from California to Florida.[4]

---

[2] Unless otherwise noted, citations to the parties' Rule 56.1 statements concern factual assertions that are admitted or are deemed admitted because they were not contradicted by citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . .  fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

[3] On September 14, 2005, CHRW and CNR entered into an "Agreement For Motor Carrier Services," which was in effect at the time of the June shipment.  (Def. R. 56.1 Stat. ¶ 18; Def. R. 56.1 Stat., Ex. Q)

[4] On September 26, 2006, CHRW entered into an "Agreement For Motor Carrier Services" with Eduardo Perez, doing business as Big Ed Express, which governed the July shipment.  (Def. R. 56.1 Stat., Ex. R)  CHRW filed a third-party complaint against Perez on May 20, 2009 (Def. R. 56.1 Stat., Ex. I), but on September 2, 2009, this Court entered an order staying the proceedings against Eduardo Perez in light of his Chapter 11 bankruptcy petition.  (Def. R. 56.1 Stat. ¶ 11)

(Def. R. 56.1 ¶ 8.)  This shipment was damaged as the result of a piece of road debris that became tangled in the truck's wheels and caught fire.  (Am. Cmplt. ¶ 13; Def. R. 56.1 ¶¶ 9-10; Def. R. 56.1 Stat., Ex. H)  Plaintiff alleges $295,000 in damages concerning the second shipment.  (Am. Cmplt. ¶ 16.)

It is undisputed that there was no written agreement between CHRW and Ricoh governing their relationship.  Ricoh's hired CHRW for transportation services on a "spot transaction" basis.  (Pltf. Resp. to Def. R. 56.1 Stat., Ex. 1 (Parelly Tr.) at 13-14)  It is likewise undisputed that CHRW did not prepare either shipment for transportation, and that Ricoh prepared the bills of lading for both shipments – which identified CHRW as the carrier – without input from CHRW.  (Def. R. 56.1 Stat. ¶¶ 12, 14; Pltf. Resp. to Def. R. 56.1 Stat. ¶¶ 14, 24)

The Amended Complaint alleges claims under the Carmack Amendment, as well as state law causes of action for breach of bailment obligations, negligence, and breach of contract concerning both the June and July shipments.  (Am. Cmplt. ¶¶ 17-37, 42-44)  As to the July shipment only, Nipponkoa also brings a tort claim, alleging "gross negligence and/or reckless and/or willful misconduct."  (Am. Cmplt. ¶¶ 38-41)

## DISCUSSION

I.  **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate only when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Whether facts are material is a determination made by looking to substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Whether "[a] dispute about a genuine issue exists" depends on whether "the evidence is such that a reasonable jury could

decide in the non-movant's favor." Beyer v. Cnty of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (internal quotation marks omitted). Courts "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001). However, "a party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" Lipton v. Nature Co., 71 F.3d 464, 469 (2d Cir. 1995) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986)).

## II.   CARMACK AMENDMENT CLAIMS

### A.   Statutory Framework

The Carmack Amendment to the Interstate Commerce Act of 1887 governs the liability of motor carriers for loss or damage to goods transported in interstate commerce. See 49 U.S.C. § 14706(d). "In enacting it, Congress intended to provide interstate carriers with reasonable certainty and uniformity in assessing their risks and predicting their potential liability." Project Hope v. M/V IBN SINA, 250 F.3d 67, 73 n.6 (2d Cir. 2001) (citing Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 381 (5th Cir. 1998); Shao v. Link Cargo (Taiwan) Ltd., 986 F.2d 700, 704 (4th Cir. 1993)).

Congress also intended, however, to "relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods." Reider v. Thompson, 339 U.S. 113, 119 (1950). Accordingly, the Carmack Amendment gives a shipper the "right to proceed against the initial carrier in a case where damage or loss occurred while the shipment was in the hands of a subsequent carrier." Aaacon Auto Transp., Inc. v. State Farm Mut. Auto. Ins. Co., 537 F.2d 648, 653 (2d Cir. 1976) "Carmack effectively codified the strict liability rule that governed the liability of common

carriers at common law." Sompo Japan Ins. Co. of Am. v. Union Pac. R.R. Co., 456 F.3d 54, 59 (2d Cir. 2006) (citing Missouri Pac. R.R. Co. v. Elmore & Stahl, 377 U.S. 134, 137 (1964)), abrogated on other grounds by Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp., 130 S. Ct. 2433, 2440 (2010)).

In sum, "[t]he Carmack Amendment establishes a single uniform regime for recovery by shippers 'directly from [the] interstate common carrier in whose care their [items] are damaged,' and . . . 'preempt[s][the] shipper's state and common law claims against a carrier for loss or damage to goods during shipment.'" Project Hope, 250 F.3d at 73 n.6 (quoting Windows, Inc. v. Jordan Panel Sys. Corp., 177 F.3d 114, 117-18 (2d Cir. 1999); Ward v. Allied Van Lines, Inc., 231 F.3d 135, 138 (4th Cir. 2000)).

Where the Carmack Amendment applies, "[i]n an action to recover from a carrier for damage to a shipment, the shipper establishes his prima facie case when he shows delivery in good condition, arrival in damaged condition, and the amount of damages." Missouri Pac. R.R. Co., 377 U.S. at 137-38; accord Project Hope, 250 F.3d at 73 n.6. Once a shipper makes this showing, a carrier seeking to avoid liability must demonstrate that the damage was caused not by negligence but "by (a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." See Missouri Pac. R.R. Co., 377 U.S. at 137 (1964) (citing Chesapeake & O. Ry. Co. v. A. F. Thompson Mfg. Co., 270 U.S. 416, 421-423; Adams Express Co. v. Croninger, 226 U.S. 491, 509 (1913); Hall & Long v. Nashville & C.R. Co., 80 U.S. (13 Wall.) 367, 372 (1871)) (internal quotations omitted).

After "liability under the Carmack Amendment has . . . been established, '[t]he inquiry then becomes the amount of damages and, usually, whether the carrier legitimately limited its liability for the shipment to a specified value or amount.'" St. Paul Fire & Marine Ins.

Co. v. Schneider Nat'l Carriers, Inc., No. 03 Civ. 5197, 2006 WL 522455, at *7 (S.D.N.Y. Mar. 3, 2006) (quoting A.I.G. Uruguay Compania de Seguros, S.A. v. AAA Cooper Transp., 334 F.3d 997, 1003 (11th Cir. 2003)). Under the "reasonable opportunity" doctrine, in order to properly limit its liability under the Carmack Amendment, a carrier must give the shipper a reasonable opportunity to choose between two or more levels of liability. See Travelers Indem. Co. of Ill. v. Schneider Specialized Carriers, Inc., No. 04 Civ. 5307, 2005 WL 351106, at *5 n.4 (S.D.N.Y. Feb. 10, 2005) (citing Rohner Gehrig Co., Inc. v. Tri-State Motor Transit, 950 F.2d 1079, 1081 (5th Cir. 1992) (en banc); Hughes v. United Van Lines, Inc., 829 F.2d 1407, 1415 (7th Cir. 1987), cert. denied, 485 U.S. 913).

### B.  Applicability of the Carmack Amendment

#### 1.  Distinction Between "Carrier" and "Broker"

As a threshold matter, the "Carmack amendment imposes liability on 'carriers' [and freight forwarders] but not on 'brokers,' as those terms are defined by the statute," and thus "it is critical to determine whether a defendant was acting as a carrier [or freight forwarder,] or as a broker[,] in relation to the particular shipment that was damaged." AIOI Ins. Co. v. Timely Integrated, Inc., No. 08 Civ. 1479, 2009 WL 2474072, at *2 (S.D.N.Y. Aug. 12, 2009); Travelers, 2005 WL 351106, at *4; Chubb Group of Ins. Cos. v. H.A. Transp. Systems, Inc., 243 F. Supp. 2d 1064, 1068-69 (C.D. Cal. 2002) ("[T]he Carmack Amendment does not apply to brokers); Commercial Union Ins. Co. v. Forward Air, Inc., 50 F. Supp. 2d 255, 257 (S.D.N.Y. 1999) ("The Carmack Amendment does not provide for the liability of brokers.").

A "motor carrier" is defined in the Carmack Amendment as "a person providing commercial motor vehicle . . . transportation for compensation." 49 U.S.C. § 13102(14).

The term "freight forwarder" is defined as

> [A] person holding itself out to the general public (other than as a pipeline, rail, motor, or water carrier) to provide transportation of property for compensation and in the ordinary course of its business—
>
> > (A) assembles and consolidates, or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments;
> >
> > (B) assumes responsibility for the transportation from the place of receipt to the place of destination; and
> >
> > (C) uses for any part of the transportation a carrier subject to jurisdiction under this subtitle.

49 U.S.C. § 13102(8).

Under the statute, a "broker" is "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation."[5]  49 U.S.C. § 13102(2).

The implementing regulation provides that

> [m]otor carriers, or persons who are employees or bona fide agents of carriers, are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport.

See 49 C.F.R. § 371.2(a).

The fact that an entity is a licensed broker but is not a licensed motor carrier "is not dispositive of the issue of liability under the Carmack Amendment," Delta Research Corp. v. EMS, Inc., No. 04-60046, 2005 WL 2090890, at *5 (E.D. Mich. Aug. 29, 2005) (citing Ensco, Inc. v. Weicker Transfer and Storage Co., 689 F.2d 921, 925 (9th Cir. 1982); see also Phoenix

---

[5]  The term "transportation" is defined as "services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and property."  49 U.S.C. § 13102(23)(B).

7

Assur. Co. v. Kmart Corp., 977 F. Supp. 319, 326 (D.N.J. 1997) (registration as a broker and failure to register as a carrier are not dispositive of entity's true status), "[n]or is ownership of the vehicles used to transport the goods dispositive." Id. (citing Custom Cartage, Inc. v. Motorola, Inc., No. 98 C 5192, 1999 WL 965686 (N.D. Ill. Oct. 15, 1999))  Status "is determined not by reference to [licenses or ownership of equipment] but rather by reference to what [the entity] holds itself out to be." Ensco, Inc., 689 F.2d at 925; see also Lumbermens Mut. Cas. Co. v. GES Exposition Servs., Inc., 303 F. Supp. 2d 920, 921 (N.D. Ill. 2003) (a company's status "is not determined by how it labels itself, but by how it holds itself out to the world and its relationship to the shipper" (internal citation omitted)).  Stated another way, "[t]he law determines status according to the services offered by an entity, rather than by its corporate character or declared purpose." Delta Research, 2005 WL 2090890, at *5 (citing Mass v. Braswell Motor Freight Lines, Inc., 577 F.2d 665, 667 (10th Cir. 1978).  "The Courts look at whether the party holds itself out to the public generally as the actual transporter of goods . . . as well as the services provided under the contract." Id. (citations omitted).

In considering what services were offered, courts closely examine whether a company's statements to a shipper indicated that its "actions were not limited to arranging transport, but also exerting some measure of control over . . . drivers." Hewlett-Packard Co. v. Brother's Trucking Enters., Inc., 373 F. Supp. 2d 1349, 1352 (S.D. Fla. 2005) (denying defendant summary judgment on plaintiff's Carmack claim where defendant had promised shipper that it would "provide control, the very latest systems, transportation savings and information," and "consistent and timely transit times with quality carriers").

"The difference between a carrier and a broker is often blurry," Nebraska Turkey Growers Coop. Assoc. v. ATS Logistics Servs., Inc., No. 4:05CV3060, 2005 WL 3118008, at *4

(D. Neb. Nov. 22, 2005) (citing Delta Research Corp. v. EMS, Inc., No. 04-60046, 2005 WL 2090890, at *5 (E.D. Mich. Aug. 29, 2005)), see also CGU Int'l Ins., PLC v. Keystone Lines Corp., No. C-02-3751, 2004 WL 1047982, at *2 (N.D. Cal. May 5, 2004), and it is apparent from the case law that the carrier/broker inquiry is inherently fact-intensive and not well suited to summary judgment.

Courts frequently conclude that that there are issues of fact as to whether an entity is a carrier for purposes of the Carmack Amendment. See, e.g., Consol. Freightways Corp. of Del. v. Travelers Ins. Co., No. 00-CV-20726, 2003 WL 22159468, at *6 (N.D. Cal. Mar. 28, 2003) (finding summary judgment inappropriate because triable issues of fact remained as to whether a trade show producer was a carrier or a broker when it arranged for transportation, performed some transportation functions, was listed as the carrier on one of the shipping forms, and sent a letter thanking the shipper for "selecting GES Logistics to handle the transportation needs"); Hewlett-Packard Co. v. Brother's Trucking Enterprises, Inc., 373 F. Supp. 2d 1349, 1352 (S.D. Fla. 2005) (denying summary judgment because a reasonable fact finder could find that the defendant acted as either a motor carrier or broker where the defendant both arranged for transportation and also exerted some measure of control over the drivers); Just Take Action, Inc. v. GST (Americas) Inc., No. 04-3024 ADM/RLE, 2005 WL 1080597, at *5 (D. Minn. May 6, 2005) (denying summary judgment because triable issues of fact existed as to whether the defendant played "the role of broker or motor carrier in shipping the fermenter tanks" when it arranged for transportation with a separate motor carrier but also "drafted the bill of lading and directed how the shipment would take place").

Here, Nipponkoa contends that CHRW presented itself to Ricoh and to the general public as a motor carrier or freight forwarder, while CHRW argues that the record demonstrates that it served Ricoh strictly as a broker.

### C. <u>Analysis</u>

In arguing that it acted as a broker and not as a motor carrier or freight forwarder in connection with the shipments of Ricoh's office equipment, CHRW cites the following evidence:  First, CHRW asserts that it never had physical contact with the goods, never exercised control over the drivers who transported the goods, and never represented to Ricoh or to the public that it was a motor carrier.  (Def. R. 56.1 Stat. ¶¶ 15-17, 21-22)  CHRW further notes that it is not a licensed motor carrier and that it only has a broker's license.  (<u>Id.</u> ¶ 25)  Moreover, at the time of each shipment, CHRW had contracted with subcontractors – CNR and Big Ed Express – to pick up the equipment at Ricoh's warehouse and to deliver the goods to their destination.  (Def. R. 56.1 Stat. ¶¶ 18-20)  In these agreements, CHRW referred to itself as a "broker" and CNR and Big Ed are designated as "carrier."  (<u>Id.</u>)  Finally, CHRW asserts that its sole involvement with the physical transportation of the goods was to issue load confirmations to CNR and Big Ed Express that authorized these entities to pick up, transport, and deliver the respective shipments.  (<u>Id.</u> ¶ 20)

Nipponkoa does not dispute these statements, except as to CHRW's assertions that it did not present itself as a motor carrier and did not exercise control over the drivers.  (Pltf. Resp. to Def. R. 56.1 Stat. ¶ 17)

As to whether CHRW represented to Ricoh and to the public that it was a motor carrier, Vincent Baffuto, Ricoh's senior manager for transportation, testified that CHRW

> presented to us that they would be our single source provider or contact for moving goods from our origin to destination regarding all activities; billing,

10

> claims, communication was all through C.H. Robinson. So they were our sole source point of contact. . . . [CHRW] was [r]esponsible for coordinating pick-up, arrangements, delivery points and actually ensuring that the deliveries were done on time, complete and issue-free. . . . They were gonna be responsible for the transportation . . . from point A to point B.

(Pltf. Resp. to Def. R. 56.1 Stat., Ex. 30 (Baffuto Dep.) at 55-56; Pltf. Resp. to Def. R. 56.1 Stat. ¶¶ 31-32) Similarly, Bruce Johnson, CHRW's Manager of Carrier Services, conceded that CHRW's customers "look[] to [CHRW] as the transportation provider." (Pltf. Resp. to Def. R. 56.1 Stat., Ex. 26 (Johnson Tr.) at 15)

Baffuto also testified (and CHRW does not dispute) that with respect to the more than 900 shipments CHRW handled for Ricoh between January and June 2008, the truckers who picked up merchandise on behalf of CHRW "represent[ed] themselves as C.H. Robinson." (Pltf. Resp. to Def. R. 56.1 Stat., Ex. 16 (Baffuto Tr.) at 58-59; Pltf. Resp. to Def. R. 56.1 Stat. ¶ 37; Def. R. 56.1 Resp. ¶ 37) The more than 900 invoices that CHRW sent to Ricoh for CHRW's services rendered prior to the June and July shipments reflect charges for "Line Haul" transportation; there is no reference to brokerage commissions. (Pltf. Resp. to Def. R. 56.1 Stat., Ex. 16 (Baffuto Tr.) at 61; Pltf. Resp. to Def. R. 56.1 Stat., Ex., 41; Pltf. Resp. to Def. R. 56.1 Stat. ¶¶ 43, 45; Def. R. 56.1 Resp. ¶ 33)

Moreover, with respect to these more than 900 shipments, Ricoh designated CHRW as the carrier on each bill of lading. CHRW never objected to this designation. (Pltf. Resp. to Def. R. 56.1 Stat. ¶¶ 38-40; Def. R. 56.1. Resp. ¶¶ 38-40; Pltf. Resp. to Def. R. 56.1 Stat., Ex. 16 at 59-60) Thomas Parrelly, the Account Manager for CHRW, and Johnson, CHRW's Manager of Carrier Services, both testified at their depositions that CHRW's customary practice is to inform a customer of inaccuracies in bills of lading. (Pltf. Resp. to Def. R. 56.1 Stat. ¶¶ 40, 41; Pltf. Resp. to Def. R. 56.1 Stat., Ex. 11 (Parelly Tr.) at 60; Pltf. Resp. to

11

Def. R. 56.1 Stat., Ex. 12 (Johnson Tr.) at 12-14) Johnson further testified that where CHRW is improperly listed as a carrier on a bill of lading, CHRW "salespeople should follow up with their customer/shipper and ask them to use the actual carrier name as the carrier on the bill of lading." (Pltf. Resp. to Def. R. 56.1 Stat., Ex. 12 (Johnson Tr.) at 12) CHRW never advised Ricoh that the designation of CHRW as the motor carrier on the bills of lading was incorrect, however.[6] (Pltf. Resp. to Def. R. 56.1 Stat. ¶¶ 40-41)

Nipponkoa also argues that in a promotional brochure CHRW provided to Ricoh (Pltf. Resp. to Def. R. 56.1 Stat., Ex. 10), it holds itself out as a motor carrier and freight forwarder. (Pltf. Resp. to Def. R. 56.1 Resp. ¶ 22) It is undisputed that that brochure nowhere refers to CHRW as a "broker" (other than with respect to custom brokerage). (Pltf. Resp. to Def. R. 56.1 Stat., Ex. 4 (Def. Resp. to Req. for Admissions) at 8) On the cover of the brochure,

---

[6] This Court recognizes that the fact that a company is listed as a carrier on a bill of lading – particularly a bill of lading prepared by a third party or, as here, by the shipper – is not dispositive as to the company's status. See Travelers, 2005 WL 351106, at *4 (noting that "the fact that [Defendant] listed itself as a carrier in the straight bill of lading" was not dispositive as to its status, because "'what a party labels itself and what a party is registered as [are] never controlling'" (quoting Custom Cartage, Inc. v. Motorola, Inc., No 98 Civ. 5182, 1999 WL 965686, at *11 (N.D. Ill. Oct. 15, 1999)); Schramm v. Foster, 341 F. Supp. 2d 536, 549 (D. Md. 2004) ("[T]he identification of Robinson as the 'carrier' on the bill of lading does not prove that Robinson was in fact the carrier in this transaction."); Chubb Group of Ins. Cos. v. H.A. Transp. Sys., Inc., 243 F. Supp. 2d 1064, 1070 (C.D. Cal. 2002) (holding that an erroneous bill of lading prepared by a third party is insufficient to establish the defendant's motor carrier status where defendant played no role in its preparation).

Bills of lading are offered here for a somewhat different purpose. Plaintiff argues that given Defendant's policy of correcting errors on bills of lading – including improper designations of CHRW as a carrier – CHRW's failure over the span of more than 900 bills of lading issued over a six-month period to ever point out to Ricoh that it was not the carrier constitutes proof that CHRW knew that it was holding itself out to Ricoh as a carrier. Cf. Schramm, 341 F. Supp. 2d at 549 (in holding that "bill of lading does not prove that Robinson was in fact the carrier," court noted that "Robinson did not become aware that it was listed as the carrier [on the bill of lading] until after the accident occurred"). CHRW, of course, argues that it did not correct the errors "because Ricoh had knowledge that CHRW was only a broker." (Def. R. 56.1 Resp. ¶ 40) The reason or reasons why CHRW did not correct Ricoh's alleged errors, and whether Ricoh was in fact in error, present questions of fact that must be resolved by a jury.

12

CHRW states that it offers "complete transportation & mode management," and lists a variety of ground, air, and marine options. (Pltf. Resp. to Def. R. 56.1 Stat., Ex. 10) The cover also lists "freight forwarding" as a service CHRW offers. (Id.) Inside the brochure, CHRW states that "[w]hile your shipment is in transit, we manage every aspect of the process so your freight moves efficiently between and within continents." (Id. at 4.) CHRW further states that the "combination of our intermodal and truckload volume places us in a position to deliver a growing list of unique opportunities. . . ." (Id. at 3) "Put our road power to the test. See how our truck services can strengthen your business."[7] (Id. at 6)

Nipponkoa also notes that in CHRW's 2007 10-K, CHRW represents that it plays the part of a principal, rather than that of a broker, in its dealings with customers: "We are a principal in the transaction. By accepting the customer's order, we accept certain responsibilities for transportation of the shipment from origin to destination." (Pltf. Resp. to Def. R. 56.1 Stat., Ex. 19)

Finally, with respect to CHRW's control over the truckers, Nipponkoa has offered evidence that CHRW provides precise delivery day/time instructions, sets the route the trucker should take, specifies the equipment to be used, the number of drivers needed, and imposes penalties for late delivery. (Pltf. Resp. to Def. R. 56.1 Stat., Ex. S, T)

Considering the record as a whole,[8] this Court cannot rule as a matter of law that CHRW's role with respect to the June and July 2008 shipments was that of a broker. Based on

---

[7] With respect to CHRW's argument that its contracts with the truckers make clear that the truckers are the carriers, and CHRW is a broker, Nipponkoa has offered evidence that Ricoh was not a party to either agreement, that these agreements were never provided to Ricoh, and that Ricoh had no knowledge of these agreements. (Pltf. Resp. to Def. R. 56.1 Stat. ¶¶ 18-19)

[8] Nipponkoa and CHRW have submitted unsworn letters from individuals described as "trucking" and "transportation" experts. (Pltf. Resp. to Def. R. 56.1 Stat., Ex. 9; Def. R. 56.1 Stat., Ex. U) In these letters, the parties' alleged experts reach conflicting conclusions as to

Plaintiff's evidence discussed above – particularly Baffuto's testimony, CHRW's invoices to Ricoh, CHRW's failure to seek correction of the more than 900 bills of lading, and the statements in its 10-K and promotional brochure – a reasonable jury could find that CHRW held itself out to Ricoh and to the general public as "providing commercial motor vehicle . . . transportation for compensation."  49 U.S.C. § 13102(14).  The cases discussed above (see pp. 7-9, supra) make clear that the evidence offered by CHRW – including its lack of a carrier license and its agreements with the truckers (which were not disclosed to Ricoh or the general public) – does not demonstrate that it was broker rather than a carrier as a matter of law.  See also CGU Intern. Ins., 2004 WL 1047982, at *2 ("[I]f Keystone accepted responsibility for ensuring delivery of the goods, regardless of who actually transported them, then Keystone qualifies as a carrier.  If however Keystone merely agreed to locate and hire a third party to transport the machines, then it was acting as a broker.").

        Because CHRW's status as a broker or carrier cannot be determined as a matter of law, its motion for summary judgment concerning Plaintiff's Carmack Amendment claim must be denied.[9]  See Trans-Pro Logistic Inc. v. Coby Elecs. Corp., No. 05 Civ. 1759, 2010 WL

---

CHRW's status with respect to the June and July 2008 shipments.  Courts have held uniformly that unsworn expert reports or letters are inadmissible at summary judgment.  See Berk v. St. Vincent's Hosp. and Med. Ctr., 380 F. Supp. 2d 334, 352-53 (S.D.N.Y. 2005) ("[U]nsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e), and cannot be used to defeat a summary judgment motion without additional affidavit support."); Brazier v. Hasbro, Inc., No. 99 Civ. 11258, 2004 WL 1497607, at *2 (S.D.N.Y. July 6, 2004) (holding that submission of unsworn letters from expert "is an 'inappropriate response' to a summary judgment motion, and factual assertions made in such letters are 'properly disregarded by the court.'" (quoting United States v. All Right, Title & Interest in Real Prop. & Appurtenances, 77 F.3d 648, 657-58 (2d Cir. 1996)).  Accordingly, this Court has disregarded the parties' expert reports for purposes of resolving Defendant's summary judgment motion.

[9]  Because this Court cannot determine as a matter of law that the Carmack Amendment is applicable here, the Court can likewise not rule as a matter of law that Plaintiff's breach of contract and breach of bailment claims are preempted by the Carmack Amendment.  Accordingly, Defendant's motion for summary judgment will be denied as to those claims.

4065603, at *3 (E.D.N.Y. Oct. 15, 2010) ("Since the Court previously found that there is a material factual dispute regarding Trans-Pro's status as a broker or carrier . . . and thus whether the Carmack Amendment governs the transaction between Trans-Pro and Coby, the Court cannot decide such an issue in a motion for summary judgment."); Custom Cartage, 1999 WL 965686, at *11 ("The gravamen of determining Custom's status is its relationship with Motorola. Because the facts regarding Custom's relationship with Motorola are not undisputed, the Court denies Motorola's and TCS's motion for summary judgment alleging that Custom is a carrier, and not a broker.").

### III.  PLAINTIFF'S CLAIMS FOR NEGLIGENCE AND GROSS NEGLIGENCE WILL BE DISMISSED

Nipponkoa argues that CHRW was negligent in failing to ensure that the truckers it hired to deliver Ricoh's shipments were properly licensed and registered. (Pltf. Br. 24) The sole evidentiary support for these claims appears to be a statement in an expert's report asserting that the Department of Transportation revoked CNR's operating authority "on July 28, 2008, two days prior to the ship date and six days prior to the [July] accident." (Pltf. Resp. to Def. R. 56.1 Stat., Ex. 8 (Morgan Report) at 8; Pltf. Resp. to Def. R. 56.1 Stat. ¶ 58) Nipponkoa does not put forth any evidence whatsoever as to the trucker for the second shipment, Eduardo Perez, d/b/a Big Ed Express.

As discussed above (see p. 13-14 n.8, supra), a material issue of fact cannot be created through submission of an unsworn expert report. See Berk v. St. Vincent's Hosp. and Med. Ctr., 380 F. Supp. 2d 334, 352-53 (S.D.N.Y. 2005); Brazier v. Hasbro, Inc., No. 99 Civ. 11258, 2004 WL 1497607, at *2 (S.D.N.Y. July 6, 2004); United States v. All Right, Title & Interest in Real Prop. & Appurtenances, 77 F.3d 648, 657-58 (2d Cir. 1996). In any event, it is undisputed that CNR served as the trucker for the June 20, 2008 shipment and that Eduardo

15

Perez was the trucker for the July 30, 2008 shipment. (Def. R. 56.1 Stat. ¶¶ 6, 8) Accordingly, proof that CNR's operating authority was revoked on July 28, 2008, does not support Plaintiff's argument that CHRW was negligent in hiring CNR to perform the June 20, 2008 shipment. Plaintiff's causes of action for negligence and gross negligence will be dismissed.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is granted as to Plaintiff's claims for negligence and gross negligence (Am. Cmplt., Third, Sixth, Seventh Causes of Action) but otherwise denied. The Clerk of the Court is directed to terminate the motion. (Docket No. 22)

The parties are directed to consult and comply with Rule 9 of this Court's Individual Rules with respect to submission of a joint pretrial order within 30 days of this decision.

Dated: New York, New York
       February 18, 2011

SO ORDERED.

_Paul G. Gardephe_
Paul G. Gardephe
United States District Judge